IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| REXA, INC.<br><br>   Plaintiff,<br><br>v.<br><br>MARK VINCENT CHESTER<br>AND MEA INC.,<br><br>   Defendants. | Civil Action No. 17 CV 8716<br><br>**Demand for Jury Trial** |

## COMPLAINT

Plaintiff REXA, Inc. ("REXA" or "Plaintiff"), by its undersigned attorneys, alleges as follows against Defendants Mark Vincent Chester ("Chester") and MEA Inc. ("MEA") (collectively, "Defendants"):

## NATURE OF SUIT

1. This is an action by REXA, a leader in the development and manufacture of hydraulic and electro-hydraulic actuators, against its former employee, Mark Vincent Chester, and his current employer MEA, that arises out of Defendants' misappropriation of REXA's trade secret designs for solenoid-based electro-hydraulic actuators, which Defendants improperly, and without REXA's consent, disclosed and claimed in U.S. Patent Application No. 14/511,463 ('463 application).

2. REXA seeks injunctive relief and monetary damages to remedy Defendants' acts of misappropriation, act of erroneous listing of the incorrect inventor of the invention disclosed and claimed in the '463 application, acts of unfair competition, and conversion; and Chester's breach of contract. REXA further seeks a declaration that all right, title, and interest in and to

the '463 application is the property of REXA, and an order requiring Chester and/or MEA to execute an assignment to REXA of all rights to the '463 application.

## THE PARTIES

3. Plaintiff, REXA, Inc., is a Delaware corporation having a place of business located at 4 Manley Street West Bridgewater, MA 02379.

4. Upon information and belief, Defendant Mark Vincent Chester ("Chester") resides at 910 Angle Tarn, West Dundee, IL 60118. Chester is a former employee of REXA. Upon information and belief, Chester is currently an employee of MEA, holding the title of Director of Product Development.

5. Upon information and belief, Defendant MEA Inc. ("MEA") is a Illinois corporation having its principal place of business located at 2600 American Lane, Elk Grove Village, IL 60007.

## JURISDICTION AND VENUE

6. This Court has jurisdiction under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 excluding interests and costs, and there is complete diversity of citizenship between the Plaintiff and the Defendants.

7. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and (c) because both Defendants are residents of Illinois and of this judicial district.

## FACTUAL BACKGROUND

8. REXA develops, manufactures, and markets hydraulic and electro-hydraulic actuators for a range of industries including the power, oil & gas, mining, metals, rotating equipment, water, and wastewater industries. REXA was founded upon a need in the marketplace for a better actuator for the process control market. In 1993, the company was acquired by, and became a division of, a newly formed corporation called Koso America, Inc.

('Koso"). Koso retained the REXA brand name and the actuator division of Koso continued to be referred to by the REXA name. In 2014, Koso divested the REXA division into what is known as REXA, Inc. today.

9. On July 10, 1998, REXA hired Chester at the company's West Bridgewater, Massachusetts, headquarters as a project engineer. He later became REXA's Mechanical Engineering Manager.

10. In the late 1990s through the early 2000s, REXA only had one location: its offices and manufacturing facilities in West Bridgewater, Massachusetts, which had about fifty employees. In 2000, REXA added a service and distribution location in Houston, Texas. Today, these remain REXA's only two locations. REXA's small size allowed it to function without the level of formalism that encumbers larger organizations.

11. REXA's founder, J. Robert Glomeau ("Glomeau"), invented the use of flow matching valves in hydraulic actuators in order for the actuator to maintain its position without consuming energy to hold its position. This invention was patented as U.S. Patent No. 4,625,513 (the '513 patent), among others. In all, Glomeau was the named inventor on 5 issued patents that covered aspects of REXA's actuator designs.

12. Like all of REXA's other employees at the time, Chester never entered into a formal employment agreement with REXA, but as REXA's Mechanical Engineering Manager, it was understood by both REXA and Chester that that Chester's job responsibilities included leading efforts to improve and develop actuators for his employer, REXA, and that patentable inventions might result from the work that he was to do or the ideas that he might conceive. Chester further served as REXA's liaison with outside counsel regarding intellectual property matters. And Chester worked in an environment where it was understood that all actuator

designs, methods of manufacturing, and all associated innovations were kept as REXA trade secrets, if they were not patent protected by REXA.

13. REXA paid Chester a regular salary and benefits from the time he was hired through the time he ceased working for REXA.

14. REXA regularly assigned Chester projects to improve certain aspects of existing actuator design or to develop entirely new actuator designs. Such requests for new designs or product modifications frequently came through a formal process called "Request for Design," abbreviated as "RFD." The RFDs contained information such as the name of the requestor, the date of the request, the quantity of the design to be manufactured, the due date of the design and the specifications of the design.

15. Chester would receive these RFDs and work with his engineering staff to fulfill the design requests. Each year, RFDs would be submitted and any time a new or modified design resulted from the process, it was understood by REXA and its employees, including Chester, that the resulting design or modification was property of REXA, and a REXA trade secret until REXA chose to make any particular design public through sale of the actuator or through distribution of the design to REXA's customers. The design templates used in the relevant period each contained the following statement: "THIS DRAWING AND ALL INFORMATION HEREIN IS THE PROPERTY OF REXA CORPORATION. IT IS CONFIDENTIAL AND MUST NOT BE MADE PUBLIC OR COPIED AND IS SUBJECT TO RETURN UPON DEMAND."

16. On or about July 11, 2002, Michael Brennan, REXA's Manager, Engineering & Marketing, assigned Chester a project to develop a new design for REXA's electro-hydraulic actuators, which was internally referred to as RFD No. 02-122. The stated goal of RFD No. 02-

122 was to eliminate the use the "existing flow matching valve[s]" in the existing actuator designs, thereby creating for REXA a "new design" that could "provide a new patent" owned by REXA.

17. Chester in turn assigned Mr. Kenneth Enos ("Enos"), a mechanical product engineer at REXA, to work on the RFD 02-122 project. Enos, at the time, reported to Chester in the engineering department of REXA.

18. Enos, with the support of Mr. Ralph Goldsmith ("Goldsmith"), an electrical product engineer at REXA, successfully developed new electro-hydraulic actuator designs, which replaced the existing flow matching vales, as requested by RFD 02-122. The designs used solenoid valves in place of the flow matching valves to achieve a similar operation. The team of Enos and Goldsmith created a working prototype of an embodiment of the new solenoid-based designs along with software that controlled the operation of the prototype and controlled the operation of the solenoid valves within the prototype.

19. The source code that operated the prototype is dated July 26, 2002.

20. At the time of the invention, Enos and Goldsmith, like Chester, each had an obligation to assign any invention of theirs to REXA. Neither Enos nor Goldsmith dispute this obligation.

21. Enos and Goldsmith then presented the prototype to Chester.

22. Less than a year after the successful development of REXA's solenoid-based electro-hydraulic actuator designs, Chester tendered his resignation to REXA on July 14, 2003.

23. At the time of Chester's resignation, REXA's solenoid-based electro-hydraulic actuator designs remained a trade secret. REXA never gave Chester permission to take any REXA trade secret information with him on his departure from the company.

24. On information and belief, MEA is a manufacturer of actuators for industrial applications. As of October 2012, on information and belief, MEA's product lines were limited to large actuators that include continuously operating pumps, reservoirs, servo valves, and filtration systems that were principally used for automation of Wilson Snyder Switch Valves (currently MEA's Phoenix line of products) and controlling Fluid Catalytic Cracking Unit slide valve applications in oil refineries (currently MEA's Eagle line of products).

25. On information and belief, MEA hired Chester in October 2012 as a Product Development Engineer.

26. On October 10, 2014, unbeknownst to REXA, attorneys for MEA filed the '463 application with the U.S. Patent and Trademark Office, naming Chester as the sole inventor, and MEA as the assignee.

27. The '463 application discloses and claims solenoid-based actuator designs that are substantially identical to the solenoid-based actuator designs that Enos and Goldsmith created in response to the RFD 02-122 project and subsequently disclosed to Chester while all three individuals were employed by REXA.

28. Enos and Goldsmith were not listed as inventors of the '463 application, but Chester was listed as sole inventor. The omission of Enos and Goldsmith in the '463 application as inventors was erroneous, as was the naming of Chester as an inventor.

29. As of October 10, 2014, REXA had never disclosed the solenoid-based actuator designs from the RFD 02-122 project to the public. As of October 10, 2014, REXA had kept the solenoid-based actuator designs from the RFD 02-122 project as a trade secret.

30. On information and belief, MEA did not independently develop the solenoid-based electro-hydraulic actuator designs disclosed and claimed by the '463 application.

6

31. On information and belief, Chester used his knowledge of REXA's solenoid-based electro-hydraulic actuator designs as the basis for the solenoid-based actuator designs disclosed and claimed by the '463 application.

32. Chester never asked REXA for its permission to disclose its solenoid-based electro-hydraulic actuator designs to MEA. REXA never gave Chester permission to disclose its solenoid-based electro-hydraulic actuator designs to MEA.

33. On information and belief, Chester disclosed REXA's solenoid-based actuator designs to MEA.

34. Neither Chester nor MEA asked REXA for its permission to file the '463 application. REXA never gave Chester or MEA permission to file the '463 application.

35. Chester did not assign the '463 application to REXA, as he was obligated to do. Indeed, he purported to assign the '463 application to MEA.

36. On information and belief, MEA promoted Chester to "Director of Product Development" in January of 2015, just three months after Chester and MEA filed the '463 application.

37. On information and belief, MEA introduced its Hawk line of products after Chester and MEA filed the '463 application. MEA's Hawk line of products are a line of linear and rotary electro-hydraulic actuators that use solenoid-based actuator designs that are substantially identical to REXA's proprietary solenoid-based actuator designs. On information and belief, prior to the launch of the Hawk line of products, MEA had never designed or commercialized a self-contained electro-hydraulic actuator that did not use continuously operating pumps, reservoirs, servo valves, and filtration systems as their legacy Phoenix and Eagle products did.

38. Neither Chester nor MEA asked REXA for its permission to use its proprietary solenoid-based electro-hydraulic actuator designs in MEA's Hawk line of products. REXA never gave Chester or MEA permission to use its proprietary solenoid-based electro-hydraulic actuator designs in MEA's Hawk line of products.

39. On information and belief, as Director of Product Development, Chester oversaw the development of MEA's Hawk line of products and used his knowledge of REXA's proprietary solenoid-based electro-hydraulic actuator designs as the basis for the designs embodied by the Hawk line of products.

40. On information and belief, MEA currently markets, offers to sell, and sells its Hawk line of products.

41. MEA's Hawk line of products would not function for their intended purpose without REXA's proprietary solenoid-based actuator designs.

42. On information and belief, Defendants have derived and continue to derive economic benefit from their exploitation of REXA's proprietary solenoid-based electro-hydraulic actuator designs.

43. Neither Chester nor MEA asked REXA for its permission to disclose its proprietary solenoid-based actuator designs to the public. REXA never gave Chester or MEA permission to disclose its proprietary solenoid-based actuator designs to the public.

44. On April 14, 2016, the '463 application was published as U.S. Patent Application Publication No. US 2016/0102685 A1 (the '685 publication). The '685 publication made REXA's proprietary solenoid-based actuator designs publicly available. A copy of the '685 publication is attached as Exhibit A.

45. Defendants' actions caused REXA's proprietary solenoid-based actuator designs to cease their existence as REXA trade secrets.

46. On January 27, 2017, the examiner of the '463 application indicated that certain claims of the pending application constituted allowable subject matter.

47. In a letter dated May 17, 2017, REXA, by its counsel, informed Townes Comer, MEA's President, of MEA and Chester's misappropriation of REXA's proprietary technology and demanded that MEA assign to REXA all interest in the '463 application and for MEA to cease its sales of its Hawk line of products.

48. On July 25, 2017, MEA's attorneys filed a response to the examiner's office action, amending the claims to place them in a condition of allowance.

49. MEA has repeatedly refused to assign REXA its interest in the '463 application. On information and belief, MEA continues to offer its Hawk line of products for sale.

## COUNT I
**(Misappropriation of Trade Secrets)**

50. REXA incorporates the allegations contained in each preceding paragraph above as though fully set forth herein.

51. REXA possessed valuable trade secret information embodied by its solenoid-based actuator designs created by Enos and Goldsmith.

52. REXA's solenoid-based actuator designs were trade secrets of REXA's that were not known within the industry or to the public at large. REXA had yet to incorporate its solenoid-based actuator designs into any REXA commercial products making said designs not readily ascertainable by proper means by others.

53. REXA had undertaken proper and reasonable efforts to insure that its innovative technology and designs remained trade secrets known only to REXA and to others under either implied-in-fact obligations of confidentiality or under written confidentiality agreements.

54. Before Defendant's unlawful acts in disclosing REXA's solenoid-based actuator designs, the designs were not readily discoverable by the public.

55. Chester misappropriated REXA's trade secrets at least by disclosing REXA's solenoid-based actuator designs to MEA, by incorporating the same into the '463 application, which was subsequently made publicly available through the '685 publication, and by incorporating the same into the designs of MEA's Hawk line of products, all without REXA's express or implied consent.

56. MEA misappropriated REXA's trade secrets at least by the actions of MEA's employee Chester, who was acting within the scope of his employment and further by MEA's failure to assign the '463 application to REXA, and MEA's refusal to cease and desist the sale of its Hawk line of products, products which incorporate REXA's trade secrets in order to achieve their intended function. MEA has continued such unlawful and malicious behavior despite being placed on notice by REXA of its continued misappropriation of REXA's trade secrets, constituting a conscious and willful disregard for REXA's rights.

57. Defendants' conduct constitutes misappropriation and misuse of REXA's confidential proprietary information and trade secrets under applicable state and common law, including Massachusetts General Law, Ch. 90, § 42 and the Illinois Trade Secrets Act, 765 Ill. Comp. Stat. 1065/1-9.

58. As a result of Defendants' acts, REXA has been and continues to suffer damage in an amount to be proven at trial.

59. REXA is entitled to recover the amount that Defendants have been unjustly enriched as a result of their unlawful actions.

60. REXA will suffer irreparable harm should Defendants' unlawful conduct be allowed to continue to the detriment of REXA, and Defendants' unlawful conduct should be enjoined as a result of its willful and malicious misappropriation.

61. Defendants' actions were willful, malicious and deliberate entitling REXA to exemplary damages and the recovery of its attorneys' fees in addition to actual damages and disgorgement of Defendants' unjust enrichment.

## COUNT II
### (Conversion)

62. REXA incorporates the allegations contained in each preceding paragraph above as though fully set forth herein.

63. The solenoid-based actuator designs which resulted from the RFD 02-122 project are owned by REXA and have independent economic value to REXA.

64. Defendants have intentionally converted such property to their own use in violation of REXA's ownership and interests in the rights and without REXA's consent.

65. As a result of Defendants' unlawful conduct, REXA has been and will continue to be damaged.

66. REXA will suffer irreparable harm should Defendants' unlawful conduct be allowed to continue to the detriment of REXA.

67. REXA's remedy at law is not by itself adequate and REXA has suffered and continues to suffer irreparable harm such that REXA is entitled to injunctive relief.

68. Defendants' actions were willful, malicious and deliberate entitling REXA to punitive damages and the recovery of its attorneys' fees in addition to return of REXA's converted property, actual damages, and disgorgement of Defendants' unjust enrichment.

## COUNT III
### (Unfair Competition)

69. REXA incorporates the allegations contained in each preceding paragraph above as though fully set forth herein.

70. Defendants knowingly and willfully misappropriated REXA's solenoid-based actuator designs in order to gain a competitive advantage.

71. Defendants market the Hawk actuators through a brochure that states that the Hawk products are a "actuator revolution" that "represents decades of hydraulics experience, industry insight and technology" when in fact the claimed "revolution" was not through MEA's own experience or technology, but that of the REXA's solenoid-based actuator designs that Defendants misappropriated. A copy of a brochure marketing the Hawk products is attached as Exhibit B.

72. Defendants thus have made false and misleading statements to the public about the origin of the enabling technology of their Hawk products with the intent of increasing MEA's market share and/or decreasing REXA's market share in the actuator market.

73. Defendants deliberately, willfully, and in bad faith committed the aforementioned actions in violation of Massachusetts General Law, Ch. 93A, § 11, Illinois' Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/1-7, and common law entitling REXA to an award of actual consequential and punitive damages as against Defendants in addition to actual damages and disgorgement of Defendant's unjust enrichment.

12

## COUNT IV
### (Breach of Implied Contract)

74. REXA incorporates the allegations contained in each preceding paragraph above as though fully set forth herein.

75. Chester was employed by REXA at least from 1999 through July 14, 2003, for the specific purpose of inventing new actuators for REXA and making improvements to REXA's existing actuators. Chester was specifically assigned to the RFD 02-122 project which requested that Chester invent a new actuator design that could result in a new patent for REXA.

76. In response to the RFD 02-122 project, Enos and Goldsmith did invent new solenoid-based actuator designs and communicated those designs to Chester, while Chester was employed by REXA. That solenoid-based actuator designs being the ones disclosed and claimed by the '463 application.

77. There was, therefore, an implied-in-fact contract requiring Chester to assign any rights that he may have had in the invention disclosed and claimed by the '463 application to REXA. *See, e.g., Teets v. Chromalloy Gas Turbine Corp.*, 83 F.3d 403, 407-09 (Fed. Cir. 1996); *Nat'l Dev. Co. v. Gray*, 316 Mass. 240, 247-48 (1944).

78. Chester breached this implied-in-fact contract by failing to assign his ownership rights in the invention disclosed and claimed by the '463 application to REXA.

79. Chester's purported assignment of the '463 application to MEA is, and should be declared void and Chester should be required to specifically perform his obligations under his implied-in-fact contract with REXA to assign to REXA all equitable and legal rights to the '463 application.

## RELIEF REQUESTED

Therefore, REXA requests that the Court enter judgment as follows:

A. Declaring there was an implied-in-fact contract between Chester and REXA including a duty for Chester to assign any invention he made, or those reporting to him made, during the course of Chester's employment at REXA, to REXA, and to further keep REXA's proprietary actuator designs secret;

B. Declaring that Chester breached such implied-in-fact contract by not assigning any interest he may have in the solenoid-based actuator designs which resulted from the RFD 02-122 project and which are disclosed and claimed in the '463 application to REXA and further by disclosing those same designs to MEA and the public without REXA's consent;

C. Declaring the assignment of the '463 application from Chester to MEA void and requiring Chester to execute an assignment to REXA, or in the alternative, requiring MEA to execute an assignment to REXA, whereby either assignment conveys all equitable and legal rights to the '463 application;

D. Enjoining MEA from marketing and selling its Hawk line of products;

E. Awarding REXA money damages in an amount to be proved at trial, including prejudgment and post-judgment interest thereon, as well as multiple damages under Massachusetts General Law, Ch. 90, § 42, Ch. 93A, § 11, the Illinois Trade Secrets Act, 765 Ill. Comp. Stat. 1065/1-9, and/or the Illinois' Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/1-7;

F. Awarding REXA such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

REXA demands a trial by jury on all claims so triable.

Dated:  December 4, 2017

/s/ *Michael A. Albert*
Michael A. Albert
Attorney No. 558566
malbert@wolfgreenfield.com
Jason W. Balich
jbalich@wolfgreenfield.com
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
617.646.8000 Phone
617.646.8646 Fax

*Counsel for Rexa, Inc.*

*Of Counsel:*
William P. Oberhardt
Attorney No. 3122407
woberhardt@olsonip.com
OLSON & CEPURITIS, LTD.
20 N. Wacker Drive, 36th Floor
Chicago, IL 60606
Tel: (312) 580-1180
*Counsel for Rexa, Inc.*