## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| REXA, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | 17 C 8716 |
| MARK VINCENT CHESTER and M.E.A., INC., | ) ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

### I.    Introduction

The Plaintiff, Rexa, Inc. ("REXA"), describes this case to be about a former REXA employee, Mark Vincent Chester ("Chester"), who was the manager of a project that developed a new type of self-contained electro-hydraulic actuator while working at REXA, and who then took that invention to a competitor, M.E.A., Inc. ("MEA"), and tried to patent it.  REXA alleges in its Amended Complaint that it hired Chester at the company's West Bridgewater, Massachusetts headquarters as a project engineer.  He later became REXA's Mechanical Engineering Manager.

Defendants Chester and MEA assert that REXA cannot prove that a short-lived, ill-preserved, and abandoned 2002 effort to tinker with a two-solenoid actuator was a trade secret or that MEA misappropriated any REXA-owned concept when MEA developed its advanced Hawk actuator in 2013-2016.  REXA's remaining two counts

against MEA are for conversion (Count II) and unfair competition (Count III). MEA asserts that Counts II and III depend on the trade secret allegations and are preempted by the Illinois Trade Secrets Act, 765 ILCS §§ 1065/1 et seq. Both Defendants are named in Counts I, II, and III.

Chester is the sole defendant in Count IV, which alleges breach of an implied-in-fact contract. REXA alleges that Chester was obligated to assign any rights he may have had in the invention disclosed and claimed by the '463 patent (Hawk actuator) to REXA.

## II.    **The Parties**

In its Amended Complaint, REXA alleges that Chester was hired by REXA as a project engineer, later becoming REXA's Mechanical Engineering Manager. REXA's four-count Amended Complaint alleges that Chester misappropriated trade secrets and breached an implied-in-fact contract. Allegations of this sort invariably arise out of employer-employee relationships which terminate for one reason or another with the employee assuming a similar position at a competitive company.

The relevant facts of this lawsuit are markedly different from the usual alignment of parties in trade secrets cases in both substance and in the form of their presentment. For example, the introductory allegation that Chester was hired by REXA at its West Bridgewater, Massachusetts headquarters is not true. Chester was never hired by REXA, never worked for them, and never entered into a contract of any kind for the rendition of his services.

Equally untrue is the allegation that Chester was treated like all of REXA's other

employees at the time of his hiring, and that he was paid a regular salary and benefits from the time he was hired through the time he ceased working for REXA.

What is true is that Chester never worked for REXA. Chester was hired by Koso America, Inc. ("Koso") on January 8, 1998, and worked for Koso until July 14, 2003. REXA and Koso are separate legal entities. REXA was not formed as a company until 2013. Koso continues in existence to the present day as a separate and distinct entity.

Koso had "two lines of business: (i) the design, manufacture, sale and servicing of electro-hydraulic actuators, operating under [the] 'Rexa' brand (the 'Actuator Business'), and (ii) the design, manufacture, sale and servicing of globe-style control valves, operating under its Koso Hammel Dahl 'KHD' brand (the 'Valve Business')." On June 1, 2014, Koso transferred "all of the assets comprising the Actuator Business to REXA," including "(c) [a]ll contracts, … developments, … and intellectual property reasonable or necessary to the conduct of the Actuator Business." REXA acquired assets associated with Koso's Actuator Business, while Koso kept its Valve Business.

Having never worked for REXA, there were and are no contracts between Chester and REXA. When Chester was hired by Koso on January 8, 1998, Michael Brennan was Koso's Director of Engineering and Marketing. Chester was given the title Mechanical Engineering Manager, and he reported to Brennan. Chester resigned from Koso on July 14, 2003. When he was hired by Koso, Chester was not asked to sign any employment contract with Koso then or ever. Koso never asked Chester to sign a confidentiality agreement, a nondisclosure agreement, or any sort of trade secrets

3

agreement.

In addition to the lack of any legal obligation to REXA by Chester based on contract, Chester has alleged that REXA manipulated documents to make it falsely appear that Chester received a written Confidentiality, Nonsolicitation, Non-Competition and Assignment Agreement. Chester never in fact received such a document, let alone signed one. The details of the alleged manipulation are reflected in Chester's Memorandum in Support of his Motion for Judgment under Federal Rules of Civil Procedure 56 and 37. They will be addressed later in this opinion.

REXA, the Plaintiff in this case, has conflated the name "Rexa," from a brand name, to a corporate name, and as a substitute name for Koso America, Inc., a separate and distinct corporate entity.

When Chester worked at Koso, "Rexa" was commonly used as a brand name for the actuator product sold by "Koso America, Inc." Koso identified itself with the "Rexa" brand name and used that brand name on its letterhead, on its business cards and as its company email extension, e.g., "@rexa.com." For example, Chester's business card made it clear that he worked for "Koso America, Inc." even though the business card also said "Rexa."

In its Amended Complaint, REXA has made allegations trying to capitalize on the confusion between its own name, "REXA, Inc." and Koso America, Inc.'s use of the brand name "Rexa" and a third company called "Rexa Corporation." Based on the undisputed facts produced in discovery, REXA must have known at the time that many

4

allegations in its Amended Complaint were not true because REXA is a separate entity from Koso and from Rexa Corporation. For example, in its Amended Complaint, Rexa, Inc. defines itself as "REXA":

> Plaintiff REXA, Inc. ("REXA" or "Plaintiff"), by its undersigned attorneys, alleges as follows against Defendants Mark Vincent Chester ("Chester") and MEA Inc. ("MEA") (collectively, "Defendants"):

REXA then goes on to allege that:

> Chester is a former employee of REXA.

Compare this to REXA Rule 30(b)(6) Corporate Designee's testimony:

> "Q. Okay. Are you aware -- so just to be clear, there's probably -- you understand there's no documents between --no contracts between Mr. Chester and REXA, because he didn't work for REXA; right?
> A. Correct.
> Q. Okay.
> A. He did not work for REXA, Inc."

In addition, REXA makes additional false allegations stating that it has been in existence since at least 1993. The Amended Complaint further alleges that:

> REXA develops, manufactures, and markets hydraulic and electro-hydraulic actuators for a range of industries including the power, oil & gas, mining, metals, rotating equipment, water, and wastewater industries. REXA was founded upon a need in the marketplace for a better actuator for the process control market. In 1993, the company was acquired by, and became a division of, a newly formed corporation called Koso America, Inc. ('Koso'). Koso retained the REXA brand name and the actuator division of Koso  continued to be referred to by the REXA name. In 2014, Koso divested the REXA division into what is known as REXA, Inc. today.

REXA further alleges that:

> On July 10, 1998, REXA hired Chester at the company's West Bridgewater, Massachusetts, headquarters as a project engineer. He later became REXA's Mechanical Engineering Manager.

The undisputed facts produced in discovery demonstrate that these allegations are false and that REXA, Inc. must have known that they were false when it filed its Amended Complaint.

For example, we now know that REXA's allegation in its Amended Complaint that "REXA was founded upon a need in the marketplace for a better actuator for the process control market [and] [i]n 1993, the company was acquired by, and became a division of, a newly formed corporation called Koso America, Inc." is untrue. "REXA," as that entity is defined by REXA, Inc. in its Amended Complaint, did not exist in 1993. It is undisputed based upon its own Articles of Organization that REXA, Inc. was formed in 2013 and in 2014 acquired the assets that were part of Koso's "Actuator Business." REXA was never a "division of . . . Koso America, Inc." Consequently, the undisputed facts demonstrate that Chester was never hired by REXA, Inc., he never worked for REXA, Inc., and he never became REXA, Inc.'s Mechanical Engineering Manager.

As if by way of purification of its use of the name REXA rather than Koso when describing facts, events, and conduct which the undisputed facts show are attributable to Koso, the Plaintiff offers footnote 1 at page 11 in its Memorandum in Support of Rexa's Motion for Summary Judgment. It reads, in part, "REXA's predecessor in interest is Koso America, otherwise noted, 'REXA' will also refer to 'Koso.'"

Koso was never a predecessor company in interest to REXA. That allegation is false as well. The elimination of the name of a corporation which continues to exist and the attribution of the conduct of its employees to the Plaintiff in the name of simplicity is not legitimized by acknowledging the misappropriation.

### III. <u>Background</u>

REXA is a Delaware corporation incorporated on March 28, 2013. Its principal place of business is in West Bridgewater, Massachusetts. REXA designs, manufactures, sells, and services electro-hydraulic actuators, including those known as the "Xpac."

As of 2002, Koso offered for sale a family of microprocessor-controlled self-contained electro-hydraulic actuators called the Xpac. The Xpac actuators work by creating a flow of hydraulic fluid from the motor coupled to the bi-directional hydraulic pump, then translating that fluid flow with a double acting cylinder into either rotary or linear movement. When the motor is not turning the bi-directional hydraulic pump to change the position of the piston within the hydraulic cylinder, the flow matching valves ("FMV") lock the position of the piston in place.

Defendant MEA is an Illinois corporation having its principal place of business in Elk Grove Village, Illinois. MEA sells hydraulic actuator systems known as the "Hawk." MEA was founded in 1963. MEA introduced its "Super Thrust" line of self-contained electro-hydraulic actuators ("EHA") in 1971. While MEA introduced updated versions of its self-contained EHAs over the years, by 2012 these "legacy" products were not market competitive.

Defendant Chester is domiciled in, and a citizen of, the State of Illinois. Before his employment with MEA, Chester had worked for, among others, the Electric Boat Division, General Dynamics, building nuclear submarines; the U.S. Navy, working on naval weapons systems such as torpedoes and anti-submarine rockets; and for BAE Systems, continuing his work on naval weapons systems for the U.S. Navy. Chester is currently an employee of MEA, holding the title of Senior Product Development Engineer from the time he was hired until he was named as MEA's Director of Product Development in 2016.

Prior to his employment with Koso, Chester worked designing actuating systems. He had ample experience designing hydraulic and pneumatic actuating systems.

During these experiences, he was also familiar with the use of solenoid valves. Solenoid valves are common in the actuator industry, acknowledged by REXA that everybody uses solenoid valves in hydraulics.

It is REXA's contention that its solenoid-based designs were a trade secret. It is contended that allowed claim 3 of the '463 patent application, other than one, were all met by Chester's prototype while working at Koso.

It is important to note that this lawsuit is not a proceeding in which the issue is the patentability of the claimed invention. The gravamen of REXA's case is the theft of trade secrets by Chester which appeared and were employed in the Hawk actuator many years later.

The 2002 project conducted by Chester while at Koso involved an attempt to create an actuator that did not use a FMV but used two solenoid valves in lieu thereof. Koso abandoned the experiment within two months without preserving a physical manifestation. Lacking in this record are schematics or other detailed descriptions and particulars for the manufacture and assembly requirements of the device produced. Records of testing necessary to confirm material performance characteristics and methods of operation are also non-existent.

Both the histories of Koso and REXA reflect that no attempts were ever made to return to the 2002 experiment in an effort to make it functional, improved, worthy of legal protection, or commercially marketable. The inspiration for now magnifying its importance and value, never before recognized either by Koso or REXA, is apparently the commercial success of MEA's Hawk actuator.

In its papers, REXA's argument is that Chester invented an actuator described by allowed claim 3 of the '463 application, and that REXA's own solenoid-based designs are immaterial for summary judgment purposes. REXA seeks as a just outcome in this lawsuit the rights and title to the '463 patent application, among other remedies.

REXA contends that Chester was hired as the "keeper of the technology" where he routinely handled confidential engineering drawings and was one of the select few people entrusted with highly confidential information on how FMVs were manufactured. While at Koso, Chester had direct oversight over all projects undertaken by the engineering department. Kenneth Enos ("Enos") reported to Chester. Chester

9

reported to Mike Brennan ("Brennan"), Director of Marketing and Engineering. Brennan reported to Kevin Hynes ("Hynes"), the President and CEO of Koso.

MEA disputes these assertions, alleging that Chester was hired by Koso to ensure that existing products "got out of the door in a timely manner" and to make sure production could continue, to work with draftsmen to approve their designs and answer their questions, and to work on the existing Xpac actuators.

### IV. Koso's Request for Design 02-122

In the summer of 2002, while Chester served as Koso's Mechanical Engineering Manager, employees at Koso began working on a new product development effort called the Request for Design ("RFD") 02-122. At the time, Koso had been manufacturing and selling Xpac actuators under the Rexa brand and was accordingly making royalty payments to Rexa Corporation. The RFD 02-122 stated: "The existing flow match valve still has three years remaining on the patents and thus the royalty [sic]. A new design would eliminate the payment and provide a new patent valve that is owned by KA."

The RFD 02-122 project was originated by Hynes and then communicated to Chester through his boss, Brennan. Details about the RFD 02-122 project were memorialized in a "Request for Design" form, dated July 11, 2002, and allegedly evaluated by Chester on July 12, 2002. MEA disputes that Chester evaluated the RFD, citing his testimony that he had no recollection of this specific RFD.

As part of the RFD 02-122 project, Chester first attempted to modify the FMV, as opposed to replacing it. But the effort in modifying the FMV did not prove to be

10

successful.  When modifying the FMV did not succeed, Chester tried replacing the FMVs with two solenoid valves.  A prototype actuator was created (solenoid-based prototype) using a standard commercial Xpac actuator as a starting point, where two solenoid valves were connected to the power module using a manifold in the location in the hydraulic circuit of the Xpac where the FMVs would normally be located.

### V.  **The Solenoid-Based Prototype**

The solenoid-based prototype was assembled sometime after the project began on July 11, 2002, and before the project was "canned" on August 19, 2002.  The solenoid-based prototype was dismantled shortly after the end of the RFD 02-122 project.

The parties dispute the extent of the similarities that exist between the solenoid-based prototype and the Xpac actuator.  REXA alleges that the solenoid-based prototype was mechanically identical with the standard Xpac, except for the removal of the FMVs, adding the two solenoid valves, the manifold, miscellaneous tubing, fittings, wiring, and circuit boards for the newly installed solenoid valves.

REXA further alleges that the solenoid-based prototype was operationally identical with the Xpac actuator.  Its Xpac actuators have a feedback unit and a servo motor with 0.1 horsepower to about 10.0 horsepower, 3 to 325-inch pounds of torque, and a maximum revolutions per minute ("RPM") of about 4000 to 5000.  Like the Xpac actuator, REXA alleges, the solenoid-based prototype had a range of "and/or" motors, a bi-directional pump, a motor that had from about 0.1 horsepower to about 10.0 horsepower, from about 3 to about 325-inch pounds of torque, and a maximum RPM of

11

about 4000 to 5000. REXA also alleges that the Xpac actuator and the solenoid-based prototype both could accelerate from zero to maximum RPM under load.

MEA disputes these assertions, noting that there is no evidence in the record to support the statement that the solenoid-based prototype and the Xpac were identical. While MEA does not dispute that the solenoid-based prototype incorporated certain aspects of the publicly available Xpac, it notes that some models of the Xpac actuator had stepper motors, with a maximum RPM of 1500. MEA also notes that the scant documentation available for the solenoid-based prototype shows it had one motor, a stepper motor, but did not have a bi-directional pump. Finally, MEA notes that there is no documentation to support the assertion that the solenoid-based prototype had the asserted horsepower, pounds of torque, and maximum RPM, which are identical with the Xpac.

The parties present and rely on competing expert testimony to support their respective assertions about the operational similarities and dissimilarities of the two actuators. While REXA asserts that Koso tested the operational capabilities of the solenoid-based prototype under load, MEA notes that there is conflicting testimony as to whether that actually occurred.

The effort with the solenoid-based prototype was short lived. The request for design was dated July 11, 2002, and the project was "canned" within weeks. Chester ultimately abandoned his efforts for several reasons. Among those reasons, the effort to replace the FMV technology did not work and the use of solenoid valves was so

expensive that it was not commercially practical. Also, Koso's company identity was tied to the "REXA" brand FMV. In addition, the patents that were the subject of Koso's license agreement with Rexa Corporation were about to expire so Koso would be able to use the technology without paying Rexa Corporation any royalty. Chester created no drawings of his "royalty avoidance project" work.

REXA claims that during this time, as part of the RFD 02-122 project, Koso employees Enos and Goldsmith took an existing Koso Xpac actuator, replaced the FMV with two standard Circle Seal brand solenoids, mounted them to a manifold with standard tubing and created some computer code to operate the device in order to see if that device could be used to circumvent Koso's license agreement with Rexa Corporation. REXA testified that the device was shown to Chester, but Chester did not see the code that was used to operate the device.

Although Enos created one sketch of this device, Chester was never shown that sketch. The sketch created by Enos is not an accurate depiction of the device he created. For example, the graphic portion of the sketch depicts check valves, not solenoid valves. And, the sketch depicts a device that only moves in one direction and never retracts. The device assembled by Enos did not work as hoped, and it was ultimately disassembled. The parts were either returned to inventory or discarded.

The Hawk differs from Koso's experimental device in the following ways. It does not use:

> \* an Xpac;

\*      Circle Seal solenoid valves;

\*      the special manifold that Enos designed and subsequently discarded;

\*      the tubing;

\*      the circuit board and controller which was unique to the discarded Koso device of 2002;

\*      the code.

The other undisputed and undeniable fact is that the experimental Koso device was an operational failure and deemed unworthy of further attempts to produce a workable and functional actuator. No further attempts to do so were ever made by Koso or REXA when it later came into existence.

In addition to the components of the Hawk differing from Koso's experimental device, the fact that it never worked sufficiently enough to go forward with the experiment suggests material differences in its composition, abilities, and operational efficiencies when compared with the Hawk. There can be no material dispute that Koso's less than two-month experiment did not describe or produce an invention the equal of or substantially similar to MEA's Hawk.

There is no factual basis to conclude that the RFD 02-122 project which was aborted within a couple of months is the same, or substantially the same, as the Hawk actuator. Although both projects reflected the use of some common components well known in the industry, the Hawk actuator presents a number of parts different from, and greater than, those reflected in Koso's prototype. In addition, the methods of operation

14

and functions are well developed in the Hawk and have proved commercially successful. The time and expertise devoted to the Hawk's development, when compared to the Koso prototype, clearly reflects the investment in ideas which were consummated in the Hawk. Contrast these efforts with the relative paucity of time and expense devoted to the prototype. It is telling that the project at Koso was never undertaken at Koso or, for that matter, at REXA. The Hawk has proven to be commercially valuable while the prototype never was completed or otherwise shown to be functional or useful.

## VI. Chester's Post-Koso Conduct

Aside from these substantive differences, this case also reflects other major legal differences. Sadly, it is necessary to contrast the approach taken by each side in its quest for victory.

In an attempt to buttress its position that Defendant Chester had a knowing obligation in writing to view all of his services to Koso, his employer, as worthy of being treated as secret and confidential, REXA has engaged in deceit and trickery to get him to agree to that concept. The effort was not successful.

On July 14, 2003, Chester resigned from Koso by written notice to Kevin Hynes, who was Koso's Chief Executive Officer at that time. From the time that Chester left Koso on July 14, 2003, until he was served with this lawsuit in December 2017, no one from Koso (or REXA) ever notified Chester that Koso (or REXA) claimed to have an express or implied contract with him or that he owed any obligation to Koso (or REXA) related to his work for Koso.

15

After Chester resigned from Koso, he worked for other companies in the actuator industry designing actuators and actuator systems including Lynx Actuation, Inc. ("Lynx") and Flo-Tork, Inc. ("Flo-Tork"). For example, Chester went to work for Flo-Tork in September 2003, two months after leaving Koso, where he worked as a consultant designing self-contained hydraulic actuator products and systems. Koso never gave notice to Chester or Flo-Tork that Chester was in violation of any express or implied-in-fact contract with Koso. Koso never took any legal action to limit Chester's work with Flo-Tork.

In January 2005, Chester went to work for Lynx. Lynx was a company started by Brennan, Chester's former boss and the former Director of Engineering and Marketing at Koso, who left Koso soon after Chester. Brennan started Lynx to design, manufacture and market a new brand of actuators. Chester went to work for Lynx designing and developing pneumatic and electro-hydraulic actuators. At Lynx, Chester worked with two other former Koso employees who departed Koso after Chester, namely Al Frangipane, Koso's former Director of Service, and John Canning, who worked at Koso as a designer/draftsman.

Koso was fully aware that four of its former employees had started a competing company designing, developing and manufacturing actuators; Koso never objected. Koso had substantial knowledge about Lynx and the activities of Chester, Brennan, Frangipane and Canning. In July 2005, Koso acquired a Lynx product brochure, photographs of the Lynx facility, photographs of the Lynx actuator, and photographs of

16

Chester, Brennan, Frangipane and Canning working at the Lynx facility. According to

internal Koso email communications, Koso clearly considered Lynx to be a competitor:

> Lynx Actuators was started some short while ago by Mike Brennan – Mike
> was Rexa's past Director of Engineering .... Several other ex-Rexa
> employees have joined Mike and they are now promoting a small size
> electro-hydraulic actuator.
> Lynx has apparently approached several Rexa reps to have them promote
> their new product – I want the Regional Managers to understand that we
> consider Lynx a competitor to Rexa and to strongly dissuade any Rexa rep
> from lending any support or assistance to Lynx in promoting this new
> product.
> Lynx may be only making small size actuators today and may therefore not
> appear as a direct threat to us but once they get units sold and revenue
> coming in they will surely expand their range of sizes to clash head-on with
> Rexa.

This e-mail communication was widely circulated throughout Koso, including to

Kevin Hynes (Koso's CEO), Mark Gallagher (Koso's Director of Marketing), Sam Lalos

(Koso's Director of Business Development), Robert Sass (Koso's Inside Sales

Manager), and Collin Knight (Koso's Director of Sales).

Despite Koso's knowledge that four former Koso employees, including Chester,

had started a competing actuator company, Koso never gave any notice to Chester (or to

Brennan, Frangipane, Canning or Lynx generally) that Chester was in violation of any

alleged express or implied-in-fact contract with Koso. Moreover, Koso never took any

legal action to, in any way, limit Chester's work with Lynx.

Chester went to work for MEA in October 2012, where he continued to design

and develop actuators. Over a period of more than two years, Chester worked at MEA

developing the Hawk actuator. Chester developed the Hawk actuator based upon more

than 20 years of experience in the actuator industry and based upon the designs of other MEA actuators that have used solenoid valves to control the position of the actuator that have been around since the 1970s. Not until December 4, 2017, more than 14 years after Chester resigned from Koso, did REXA claim that Chester had an implied-in-fact contractual obligation to REXA arising out of his employment with Koso.

REXA asserts that the Hawk actuator is identical with the solenoid-based prototype. Scant documentation of the prototype's specifications exist. MEA further alleges that the purpose of the RFD 02-122 was to create a different valve system, not to invent a new actuator that resembles its own Hawk actuator.

The parties do not dispute that Chester was the individual at MEA who conceived the theory of operation of the Hawk actuator, first memorialized in a memo dated March 13, 2013. But REXA alleges that Chester kept no notes or notebook regarding the development of the Hawk actuator during its development. He did not keep the hydraulic diagram of the Hawk actuator mentioned in his March 13, 2013 memo, and that no one else contributed to the conception of the Hawk actuator's theory of operation. MEA disputes this assertion, noting that Chester's notes are reflected in several memoranda and emails and that he drew several iterations of the Hawk actuator's sketch.

On October 10, 2014, Chester and MEA filed the '463 application to patent its Hawk actuator designs. The '463 application was published because it was filed on April 14, 2016, as U.S. Patent Application Publication No. US 2016/0102685 A1. REXA alleges that the '463 application disclosed its own solenoid-based designs from

18

2002 without its consent. MEA disputes that the application discloses the 2002 solenoid-based design and contends that they did not need REXA's permission to file the application.

From November 14, 2016 to August 6, 2018, MEA has sold at least 32 Hawk actuators to the public. As of August 2018, MEA has recognized revenues of $967,256 on 32 shipped units of the Hawk.

Based on these events, REXA filed an Amended Complaint against Defendants, asserting claims for misappropriation of trade secrets (Count I), conversion (Count II), unfair competition (Count III), and breach of implied-in-fact contract (Count IV) on January 17, 2018. Counts I-III are against both MEA and Chester, and Count IV is against Chester alone.

## VII.   REXA's Alleged Misconduct During Discovery

Inasmuch as the law requires that implied contracts must contain the elements of an express contract so that rights and obligations are clearly established, it was a proper inquiry during discovery to have the specific terms of that contract spelled out. In this case, it was doubly important because Chester never worked for REXA. Any claimed rights REXA supposedly possessed had to have been identified and transferred from Koso to REXA.

REXA was asked to identify the "exact and complete specific terms of the implied-in-fact contract referred to by REXA in paragraphs 77 and 78 of its Amended Complaint." REXA responded to the interrogatory as follows:

19

Subject to and without waiving the foregoing objections, REXA responds that on July 10, 1998, REXA hired Chester at the company's West Bridgewater, Massachusetts, headquarters as a project engineer. He later became REXA's Mechanical Engineering Manager. REXA further responds that as REXA's Mechanical Engineering Manager, it was understood by both REXA and Chester that Chester's job responsibilities included leading efforts to improve and develop actuators for his employer, REXA, and that patentable inventions might result from the work that he was to do or the ideas that he might conceive. REXA paid Chester a regular salary and benefits from the time he was hired through the time he ceased working for REXA. There was, therefore, an implied-in-fact contract requiring Chester to assign any rights that he may have had in the invention disclosed and claimed by the '463 application to REXA.

As can be seen, REXA's answer contains a number of falsehoods, starting with its claimed existence in 1998. As can also be seen, there is no listing of specific terms of any contract by REXA. As established between the parties, there was no written agreement between Chester and Koso which could have been transferred. Whether due to an absence of any contractual provision requiring Chester to assign any rights that he may have had in the invention disclosed and claimed by the '463 application to REXA or for some other reason, the Defendants have charged REXA with manipulating documents produced in discovery and used during Chester's deposition to falsely make it appear that he had received a "Confidentiality, Nonsolicitation, Non-Competition and Assignment Agreement."

It should now be undisputed by the parties that Chester never received such a document. What is also obviously true is that Koso never intended for Chester to receive that document because his name was not on the list of intended recipients. Chester and MEA have charged that documents were manipulated and used by REXA in an attempt

to trick Chester during his deposition.

The specifics of Chester's argument for the judgment in his favor and for imposition of sanctions for REXA's conduct are contained in Chester's Memorandum in Support of his Motion for Judgment Under Federal Rules of Civil Procedure 56 and 37. The allegations and argument are, in part, as follows:

Sometime in 2000, Koso offered a select group of eight employees a Severance Pay Plan (Severance Plan). Under the Severance Plan, the eight employees could receive guaranteed severance pay depending on their length of service with Koso if they agreed to sign a written Confidentiality, Nonsolicitation, Non-Competition and Assignment Agreement (Assignment Agreement). The Severance Plan stated that:

> Each Employee listed on Appendix A hereto, as now in effect and as amended from time to time in the sole discretion of the Board, shall be eligible to participate in the Plan, if such Employee shall have signed a Confidentiality, Nonsolicitation, Non-Competition and Assignment Agreement substantially in the form attached hereto as Appendix B (the "Confidentiality Agreement").

Appendix A is a list of the employees who were offered the Severance Plan, and Appendix B is the Assignment Agreement. Chester's name does not appear on Appendix A.

In discovery, REXA produced a copy of a Change of Company Ownership Bonus Letter (the "Bonus Letter") addressed to Chester. The Bonus Letter, dated September 20, 2000, gratuitously gave Chester a bonus at the sole discretion of the board of directors if the ownership of the company changed. This was a letter that Koso gave to

21

at least 30 other employees besides Chester. The employees did not need to sign any document or agree to any new terms of employment to receive this benefit, and there was no promise to confer any benefit since it was at the sole discretion of the board. The Assignment Agreement was not part of the original Bonus Letter.

It became apparent in discovery that REXA manipulated the Bonus Letter addressed to Chester in the following way. REXA produced Chester's Bonus Letter attached to the Severance Plan with the Assignment Agreement, even though the Severance Plan and its Appendix B Assignment Agreement were not part of the original Bonus Letter. These documents were consecutively bates labelled at REXA 0090216 through REXA 0090228. In addition, Appendix A to the Severance Plan, which would have shown that Chester was not a recipient of the Severance Plan, was missing. Although REXA produced Appendix A, it was placed in the discovery documents in a very different location at REXA 0090323, nearly 100 pages away from the Chester Bonus Letter.

Appendix A reveals that Chester never received the Severance Plan (and the corresponding Appendix B Assignment Agreement) because it identifies the recipients of the Severance Plan as follows:

Appendix A

| EMPLOYEE | WEEKS OF SEVERANCE PAY |
|---|---|
| Kevin Hynes | 150 |
| Steve Oliver | 50 |
| Mike Brennan | 50 |
| O. Chandler | 25 |
| A. Frangipane | 12 |
| L. Avarbock | 12 |
| Bon Sass | 12 |
| R. Goldsmith | 12 |

Chester's name is absent from this list.  Accordingly, Koso never offered the Severance Plan (and corresponding Appendix B Assignment Agreement) to Chester, and Chester never signed the Severance Plan or the Assignment Agreement.

By attaching the Severance Plan and its Appendix B Assignment Agreement to the Bonus Letter, however, REXA falsely made it appear as though Chester had received the Severance Plan and Assignment Agreement at the time he received the Bonus Letter. By also separating Appendix A from the Severance Plan and producing it elsewhere among the discovery documents, REXA attempted to conceal from Chester clear evidence that he had never received either the Severance Plan or the Assignment Agreement.  When REXA introduced the Bonus Letter in Chester's deposition on July 24, 2018, as Exhibit 14, REXA fabricated the exhibit to include the additional pages that

23

were not part of the Bonus Letter and asked Chester questions about it referring to the

consecutive bates numbers as though the pages comprised a single document in an

apparent attempt to trick Chester into believing that he had received the Severance Plan

and Appendix B Assignment Agreement:

> Q.  Handing you a document marked as Exhibit 14 which bears the Bates
> numbers REXA 0090216 through 228. This is a letter on REXA letterhead
> dated September 20th, 2000; is that right?
> A.  Yes, it is.
> Q.  And the letter is addressed to you?
> A.  Yes, it is.

After reading the two-page Bonus Letter which had the 10-page Severance Plan

and its Appendix B Assignment Agreement attached to it, Chester confirmed that he had

received only the Bonus Letter and not the Severance Plan or Assignment Agreement:

> Q.  Did you -- did you discuss this offer with anyone at KOSO America?
> A.  I believe Kevin [Hynes] was the one who presented the letter to me.
> However, all I received was the letter.

Later, Chester made it even more clear that he did not receive the Severance Plan

and Assignment Agreement:

> Q.  You mentioned that you only received the letter. Does that mean that
> you did not receive the remaining pages in Exhibit 14?
> A.  That's correct.
> Q.  You did not receive the pages ending 219 through 228 [Severance Plan
> and Assignment Agreement]?
> A.  I do not believe so.
> Q.  But you may have?
> A.  My recollection is simply that I received the letter, and I do not recall
> ever receiving these, 219 through 228 [i.e., the Severance Plan and the
> Assignment Agreement]. That's my recollection.

It is a standard rule of trial advocacy that any cross-examination type of question,

assuming relevancy, can be asked so long as there is a good-faith basis supporting the question. It is a sound rule and would appear to govern deposition questions of the same relationships. There was simply no good-faith basis for a plaintiff's lawyer to ask a defendant about a document he knew, or should have known, was never given or sent to the defendant witness.

The detachment of Appendix A reflecting that Chester was not on the list to receive the Severance Plan and Assignment Agreement established that he was not supposed to get the document. That Appendix A was disassociated from Appendix B is never explained, nor does REXA explain how the Appendix B Assignment Agreement somehow got connected to a Bonus Letter which Chester did receive. Chester's recollection is that the Bonus Letter did not come with an Appendix B, and REXA's own files affirm that fact. The Bonus Letter to Chester did not have any attachments.

When the president of REXA was asked about the Appendix B confidentiality agreement being connected to Chester's Bonus Letter, he said he did not know how that came about. When asked if he had a signed version of Appendix B from Chester, he answered, "Not that we can locate." Not surprisingly, Chester said he neither received nor signed an Appendix B, Severance Plan and Assignment Agreement.

In the course of discovery in this lawsuit, Chester and MEA discovered that REXA rearranged the materials in their files so as to make it appear that the Severance Plan and the corresponding Appendix B Assignment Agreement had been given to Chester when that was not true. This became apparent during the deposition of Geoffrey

25

Hynes, REXA's president, who was asked to produce at his deposition the original document folder containing the Bonus Letters and the original document folder containing the Severance Plans from a file in his office. The original folders and Hynes' testimony revealed that Chester's Bonus Letter had been appended to make it falsely appear that Chester had received the Severance Plan and the Appendix B Assignment Agreement:

> Q.  Okay.  So earlier you explained that you attached an Appendix B together with a severance pay plan to Mr. Mark Chester's [Bonus] letter within the stock plan documents review, and you said that the reason you did that had something to do with the folder that we just looked through, which the employee comp prelim, I think you called it?
> A.  Yes.
> Q.  Tell me what it is about reviewing that folder that led you to think that you should attach the stock plan -- excuse me --the severance pay plan and the Appendix B confidentiality agreement to Mr. Chester's [Bonus] letter within the stock plan documents.
> A.  I don't know.
> Q.  In the stock plan documents review file that has exclusively letters with no attachments to it.  You're saying that Mr. Chester's letter alone had an attachment which appears to be a copy of something attached to an original REXA letter from 2000.  That's how it was maintained in the file all along?
> A.  I don't know.
> Q.  Why does Mr. Chester's letter alone within this stock plan documents review file attach a copy, unsigned, of a Koso severance pay plan, together with an Appendix B confidentiality agreement, together with an Appendix C release and waiver, also unsigned?
> A.  I don't know.
> Q.  You do not have a signed version of this Appendix B from Mr. Chester. Right?
> A.  Not that we can locate.
> Q.  And to clarify, with respect to what's been previously marked as REXA Deposition Exhibit 2, did there come a time where you personally attached the Koso America severance pay plan together with Appendix B and C to the September 20, 2000, letter to Mr. Chester?

A.  It's possible I connected them.

The materials were not produced as they were kept in the ordinary course of business.  Instead, REXA manipulated the Bonus Letter addressed to Chester to make it falsely appear that Chester had received the Severance Plan and the Appendix B Assignment Agreement.  Most likely it was REXA's president who, by his own acknowledgement, testified that "[i]t's possible that I connected them [i.e., connected the Severance Plan and Assignment Agreement to the Bonus Letter]."

## VIII.  Equitable Considerations and Defenses

In addition to all of the defenses discussed above, Chester relies on the doctrines of laches and waiver in his defense.  These defenses are based on the following undisputed facts:

1.  Koso monitored Chester's employment history after he resigned from Koso; Chester went to work for numerous other actuator manufacturing companies.

2.  REXA concedes that Chester went to work at Lynx Actuation with three other former Koso employees, including Koso's former head of engineering, Michael Brennan; REXA concedes that Koso advised its regional sales managers that Lynx was a competitor of Koso.

3.  REXA admits that it never took any legal action against any of them or advised any of them that they were in violation of any express or implied contract.

4.  No one from Koso or REXA ever advised Chester that he had an implied-in-fact contract with Koso.

Laches bars a claim even when the statute of limitations has not run. Laches is an equitable doctrine of estoppel rather than a substitute for the statute of limitations. *Nature Conservancy v. Wilder Corp.*, 2009 WL 1872618, at *1 (C.D. Ill. 2009) (Mihm, J.).

Based on the related doctrines of laches and waiver, the equities overwhelmingly favor Chester in this case. Chester is directly favored by the doctrines which are equally applicable to MEA, the employer of Chester and the beneficiary of Chester's labors and talent.

## IX. Application of Law

In Count I, REXA alleged that Defendants Chester and MEA misappropriated trade secrets in violation of applicable state and common law, including Massachusetts General Law, Ch. 93, § 42 and the Illinois Trade Secrets Act, 765 ILCS § 1065/1-9. Both sides agree that Massachusetts law governs the breach of implied-in-fact contract claim. Chester was employed in Massachusetts during the relevant period by Koso America, Inc., and the Court agrees it is that state's law that governs the outcome as to Count I.

As has been described earlier in this opinion, REXA has regularly, and falsely, described itself as Chester's employer during his employment at Koso and his alleged access to and theft of trade secrets which were committed in the year 2002. As is now conceded by everyone, Chester never worked for REXA, and REXA could not have been the creator or owner of any trade secrets when it was first established. As has also

28

been established, Chester never signed any employment agreement with Koso or any agreement regarding trade secrets, confidential information, or the like. To reiterate, Chester never had any signed agreements of any kind with Koso.

It was in 2013 when REXA was formed and in 2014 when it acquired the assets that were part of Koso's actuator business. REXA was never a division of Koso. As a consequence, Chester never had a legal relationship or duty to REXA as an employee by contract. The theory of REXA's standing to sue him and others is founded, apparently, on two propositions. The first is that Chester did sign a confidentiality agreement covering trade secrets. REXA also claims that this written agreement was assigned to REXA in 2014 as part of the transfer of assets to it along with other assets.

REXA alleges that Chester had an implied-in-fact obligation to "keep the REXA solenoid-based design secrets," but breached that obligation by filing the '463 patent application and "incorporating those designs into the Hawk actuator." The authorities cited for those propositions are *Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 839 (1972), and *Whipps, Inc. v. Ross Valve Mfg. Co.*, 2014 WL 1874754, at *9 (D. Mass. 2014).

REXA also argues that "beyond Chester's implied-in-fact obligation of confidentiality, it is the sworn belief of REXA's president at the time, Kevin Hynes, that he presented Chester a nondisclosure agreement as part of a Change of Company Ownership Bonus program and that Chester signed it." (REXA Reply in Support of Its Motion for Summary Judgment at pages 13 and 14.) It is urged that REXA's inability

29

to locate a signed copy of a nondisclosure agreement signed by Chester does not void REXA's implied-in-fact contract with Chester.

For the reasons described earlier in this opinion, no reasonable jury could find that Chester signed such an agreement based on Chester's denial, the absence of a signed copy of that agreement, and the described manipulation of REXA's file documents in an attempt to induce Chester to testify contrary to his best recollection.

The facts described in both *Jet Spray* and *Whipps* establish an employer-employee relationship between the relevant parties. Based on those relationships, the law provides for an implied contract requiring the maintenance of confidentiality when it comes to matters of trade secrets of the employer which the departed employee was privy to while so employed.

The facts of both *Jet Spray* and *Whipps* are inapposite. REXA was never the employer of Chester, no matter the frequency with which REXA tries to paint it that way. The Massachusetts case much more on point is *Securitas Sec. Servs. USA, Inc. v. Jenkins*, 2003 Mass. Super LEXIS 200 (Super. Ct. of Mass. 2003).

*Securitas* involved an employee who was a senior vice president of a corporation that provided security services for his employer. The employee agreed not to divulge his employer's trade secrets or engage in activities that competed with his employer for a period of one year after his employment was terminated. The employee resigned his position in June 2003; and shortly thereafter, he accepted a position as president and chief operating officer of another corporation that provided security services and

30

competed with his former employer. The former employer filed an action against the employee, seeking a preliminary injunction prohibiting him from working for his new employer; and while that action was pending, a successor corporation acquired the former employer and named itself as plaintiff in the former employer's lawsuit. The trial court held that (1) the employee's non-competition agreement was really a forfeiture-for-competition agreement, and it did not prohibit the employee from accepting new employment; and (2) the court would not grant the successor corporation's request for injunctive relief because the employee's agreement not to compete was made with the employer, not the successor corporation.

The Superior Court of Massachusetts denied the successor corporation's request for preliminary injunctive relief. The relevant rule of law from *Securitas* to the present case has been stated as follows:

> Every one has a right to select and determine with whom he will contract, and cannot have another person thrust upon him without his consent. . . . When rights arising out of contract are coupled with obligations to be performed by the contractor, and involve such a relation of personal confidence that it must have been intended that the rights should be exercised and the obligations performed by him alone, the contract, including both his rights and his obligations, cannot be assigned without the consent of the other party to the original contract.

*Id.* at *13 (internal citation omitted).

Contrary to the attempted relationship REXA describes in its papers between Chester and itself as employer-employee, in the eyes of the law those two parties are

strangers to each other. Similarly, the relationship of duty sought to be imposed upon Chester by the law's implication is unavailing.

Even assuming there was something to assign, Massachusetts law precluded Koso from assigning any purported contract to REXA without Chester's consent. Chester never gave any consent to anyone to transfer employment rights or anything equivalent to that. As there was no employer-employee relationship with Chester necessary to the existence of an implied-in-fact contract with REXA, its claim cannot stand. The Court will not speculate whether this lack of a legal relationship between REXA and Chester was the motivation for REXA's incessant appropriation of Koso's conduct and actions as its own in its papers and its oral argument in support of its motion for summary judgment.

Chester went to work for MEA in October 2012. He continued to design and develop actuators as he had in prior employments. Over a period of more than two years, Chester worked at MEA developing the Hawk actuator. Chester asserts that the Hawk actuator was developed based upon more than 20 years of experience in the actuator industry and based upon the designs of other MEA actuators that have used solenoid valves to control the position of the actuator that have been around since the 1970s. Not until December 4, 2017, more than 14 years after Chester resigned from Koso, did REXA claim that Chester had an implied-in-fact contractual obligation to REXA arising out of his employment with Koso.

### X.    Conclusion

The Court finds the following material facts and conclusions of law from the record in this case:

1. Mark Chester was never employed by the Plaintiff, REXA.

2. Mark Chester did not have an employment contract with his employer, Koso, or a contract of any kind with Koso. Chester was an at-will employee at Koso.

3. When Koso transferred assets to newly formed REXA in 2014, no contract or other obligations allegedly owed by Chester to Koso were identified in the transfer.

4. By operation of law, any obligations owed by Chester to Koso were not and could not be transferred to REXA.

5. The project undertaken by Chester and other Koso employees identified as RFD 02-122 was aborted within two months of commencement and was never established as functional or operational.

6. The device produced during the RFD 02-122 project was not the same as or substantially similar to MEA's Hawk actuator. The evidence has established that there were material differences in the composition, abilities, and operational efficiencies between the prototype RFD 02-122 device when compared with the MEA Hawk.

7. REXA engaged in misconduct during its prosecution of this case and its conduct during the discovery phase of the case. Among other things, REXA attempted to

induce a false statement during Chester's deposition while in possession of documents reflecting the true state of affairs. Additionally, in its Amended Complaint and other papers, REXA ascribed conduct and actions taken by Koso to itself. This misappropriation of the actions of another cannot be condoned.

8. The equities characterizing the actions and conduct of the parties strongly favor MEA and Chester. REXA seeks to have awarded to itself all of the rights, title and interest in the pending patent application of the Hawk actuator. Relying on the services of employees of a different company, Koso, which it never paid for, never valued, and never used, REXA seeks the benefits of a device invented, developed and commercially exploited by a different company altogether, MEA.

Equities aside, the Court concludes that no reasonable jury could find in favor of REXA on the undisputed material facts and law governing the outcome of this case.

Counts II and III cannot stand in light of the Court's rulings as to Counts I and IV.

Accordingly, the Defendants' motions are granted, and the Plaintiff's motion is denied.

It is so ordered.

Dated: 9/10/2020

Charles P. Kocoras
United States District Judge