UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| REXA, INC., <br>           Plaintiff, <br><br> v. <br><br> MARK VINCENT CHESTER and M.E.A., INC., <br><br>           Defendants. | 17 C 8716 |

**CHARLES P. KOCORAS, District Judge:**

### MEMORANDUM OPINION

Before the Court is Defendants Mark Vincent Chester's ("Chester") and MEA Inc.'s Motion for Attorney Fees (Dkt. #174). For the following reasons, the Court grants the Motion.

### BACKGROUND

Plaintiff Mark Vincent Chester ("Chester") was employed by Koso America, Inc. ("Koso") in 2002. It was while Chester was employed at Koso that he participated in an experiment involving the subject of actuators. An actuator is a part of a device or machine that helps it to achieve physical movements by converting energy, often electrical, air, or hydraulic, into mechanical force. Simply put, it is the component in any machine that enables movement. It is the 2002 experiment upon which Rexa, Inc. ("REXA") relies for its claims in this lawsuit.

Chester worked for Koso from January 8, 1998 until July 14, 2003. Chester was

a highly educated and experienced mechanical engineer before joining Koso. He had earned a Bachelor of Science Degree in Mechanical Engineering from the University of Massachusetts in 1992 and an Associate Degree in Aeronautical Technology from Wentworth Institute in 1986, as well as a certificate in Aeronautical Technology from Wentworth Institute in 1986.

In addition to those scholastic achievements, Chester had actual experience in designing actuating systems. He first worked for the Naval Undersea Warfare Center for about four years in designing self-contained hydraulic systems for the Navy. Subsequently, Chester worked for BAE Systems, Inc. where he also designed hydraulic and pneumatic actuating systems.

It was during these experiences that Chester became familiar with the use of solenoid valves, a common and commercially available type of valve. Solenoid valves had been around since at least World War II and were common in the actuator industry. To quote Geoffrey Hynes, Plaintiff's President, "everybody uses solenoid valves in hydraulics."

It was while Chester was employed at Koso in 2002 that he participated in the creation and testing of an experimental device involving an actuator. At the time, Koso was producing and marketing an actuator called the Xpac, the main actuator sold by Koso. The object of the 2002 experiment was to develop a new valve different from the one used in the Xpac in order to avoid royalty payments made by Koso.

The Amended Complaint expressly states this objective in paragraph 16 in the

following language:

> The stated goal of RFD No. 02-122 was to eliminate the use of the 'existing flow matching valves' in the existing actuator designs, thereby creating for REXA a 'new design' that would 'provide a new patent' owned by REXA.

The Xpac actuators used flow matching valves ("FMV") to lock the position of a piston in place during its operations. The experiment was to consider solenoids as a substitute for the FMVs. The scope of the 2002 experimental project was much more limited than what was represented by the Plaintiff in its summary judgment papers.

The Defendants have accused the Plaintiff of deception in the summary judgment process by using ellipses to delete the word "valve" from the project description and then repeating the quote with the deceptive deletion in the three places in the Plaintiff's brief.

The experiment in 2002 did not last more than two months. A device was created to assist in various experiments, and several other Koso employees participated at various times. Although Plaintiff alleged that the experiment developed a working prototype, it failed to correspondingly disclose that the purported 2002 device ceased to exist. It was disassembled shortly after the experiment was canned.

There is no evidence that the 2002 device displayed reasonable performance abilities or held sufficient promise to do so in the future. Any key development documents, schematics or detailed drawings were discarded. The Plaintiff's main reliance by way of documentary evidence is a one-page sketch which never bore a confidentiality label.

3

The record in this case is devoid of any evidence that Koso or the Plaintiff returned to the experiment to further develop it. The project did not produce a workable model of significant value to preserve it for use or for later experimentation or reengagement, whether in whole or in part. It is not unreasonable to conclude that the disassembled device had no future worth. Neither Koso nor the Plaintiff made any use of the experiment or its remnants. The institution of this lawsuit has seen the attempted resuscitation of the failed experiment.

The evidence in this case establishes that the device created by Koso in 2002 was never functionally, operationally, or substantially like the MEA Hawk actuator. The value of the Hawk has been established objectively by the millions of dollars in sales it has generated in the marketplace. The lack of value of the experimental device has been objectively established by the failure of the experiment, the disassembly of the device, and the termination of the project.

Chester resigned from Koso on July 14, 2003. Subsequent employment at different companies involved Chester in the industry designing actuators and actuator systems. Some of that experience involved the use of solenoid valves to control the position of the actuator. Chester went to work for MEA in October 2012 where he continued to design and develop actuators. For over a period of two years, Chester worked on the development of the Hawk actuator. At that point, Chester had more than twenty years of experience in the actuator industry. More than fourteen years after Chester left Koso, REXA sued Chester and MEA, claiming Chester was guilty of

stealing trade secrets from Koso when he worked on the failed 2002 experiment.

The fundamental premise of the Plaintiff's lawsuit is that a failed experiment undertaken by a corporation employing Chester produced an idea and device which was the essential equivalent of an actuator designed and developed more than ten years later by the Defendants. The developed actuator, named the Hawk, has proved its efficacy and commercial worth in the marketplace. The 2002 experiment lasted no more than two months, and the device constructed in pursuit of the theories being tested was disassembled.

Stated thusly, the Plaintiff's contention in this lawsuit is that Chester stole secrets from a failed experiment which became the essential equivalent of a successful commercial product developed more than ten years later. The contention is so devoid of merit that it borders on the ludicrous. The record compiled to date does not support the Plaintiff's theory. Additionally, the way the case has been prosecuted has been called into question by the Defendants.

Both the Plaintiff and counsel for the Plaintiff have been accused of acting in bad faith. Citing specific provisions of the law as a basis in support of their petition for attorney's fees and expenses, the Defendants have set forth several factual instances in which the Plaintiff and its counsel have acted inappropriately.

5

## LEGAL STANDARD

The Court has considerable discretion in choosing to award attorney's fees. *DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 625 (7th Cir. 2013). Generally, "[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126 (2015) (cleaned up). However, "federal courts have inherent power to award attorney's fees in a narrow set of circumstances, including when a party brings an action in bad faith." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 382 (2013). The bad faith exception is narrow and generally reserved for the most egregious of circumstances. *Gaffney v. Riverboat Servs. of Indiana, Inc.*, 451 F.3d 424, 467 (7th Cir. 2006). Aside from a showing of bad faith, the Court can also award attorney's fees where a party acted "vexatiously, wantonly, or for oppressive reasons." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 557 (2014) (cleaned up). The Court analyzes Plaintiff's conduct with this exacting standard in mind.

## DISCUSSION

**1. Plaintiff's Litigation Conduct**

The lawsuit against MEA and Chester brought by REXA contains four counts in the Amended Complaint. They are: Count I – Misappropriation of trade secrets; Count II – Conversion; Count III – Unfair competition; and Count IV (only against Chester) – Breach of implied-in-fact contract.

In its Amended Complaint, REXA has alleged that Chester was hired in 1998 by

the Plaintiff at its West Bridgewater, Massachusetts headquarters as a project engineer, later becoming the Mechanical Engineering Manager. This description, albeit introductory, is significant in two respects.

The first respect is that the statement is false. Chester was never hired by the Plaintiff, REXA, anywhere. In fact, Chester never worked for REXA at any time. REXA was not formed as a company until 2013.

The second respect in which the statement is significant is that as a non-employee, Chester did not and does not have a legal employee-employer relationship with REXA and never entered into a contract of any kind for the rendition of his services to Koso. By way of explanation, Plaintiff states, "for ease of reference, the commonly-used shorthand 'REXA' was adopted to encompass all of these entities." Ease of reference, to the Court's knowledge, has never been used to describe an independent entity with a different name with different rights and obligations flowing from its independence. The body of law which governs relationships between employers and their employees will not necessarily apply to cases in which the parties to the dispute have no legal relationship other than the litigation involved. Aside from its deceptive capacity, ascribing one company's actions by the name of another company is to exalt ease of reference over truth.

The falsehood as to the relationship the Plaintiff had with Chester is repeated regularly throughout its papers, during the discovery process, and in oral arguments to the Court. As part of the written discovery between the parties and before any

7

depositions were taken, the Plaintiff was asked to identify the "exact and complete specific terms of the implied-in-fact contract referred to in paragraphs 77 and 78 of its Amended Complaint." This is how the Plaintiff responded to the interrogatory request:

> Subject to and without waiving the foregoing objections, REXA responds that on July 10, 1998, REXA hired Chester at the company's West Bridgewater, Massachusetts, headquarters as a project engineer. He later became REXA's Mechanical Engineering Manager. REXA further responds that as REXA's Mechanical Engineering Manager, it was understood by both REXA and Chester that Chester's job responsibilities included leading efforts to improve and develop actuators for his employer, REXA, and that patentable inventions might result from the work that he was to do or the ideas that he might conceive. REXA paid Chester a regular salary and benefits from the time he was hired through the time he ceased working for REXA. There was, therefore, an implied-in-fact contract requiring Chester to assign any rights that he may have had in the invention disclosed and claimed by the '463 application to REXA.

The Court's opinion of 9/10/20 cites to several falsehoods in that interrogatory answer, along with the lack of specifics requested. It is asserted in the answer that Chester had a legal obligation to assign any rights he may have had in any patentable inventions resulting from his work to REXA, the heart of the claim in the Amended Complaint.

Because of REXA's assertion of a legal obligation on Chester's part to Plaintiff, it is highly relevant to the inquiry as to whether Chester ever signed any documents to that effect, including the maintenance of secrecy for confidential information generated in the course of his work. REXA insists that Chester did indeed sign such a confidentiality agreement, but it cannot find the document in its records.

The topic was raised at Chester's deposition. While employed at Koso in 2000,

8

Koso offered a select group of eight employees a Severance Pay Plan. Under the Severance Plan, the eight employees could receive guaranteed pay depending on their length of service with Koso contingent on their agreement to sign a written Confidentiality, Nonsolicitation, Non-Competition and Assignment Agreement. This "Confidentiality Agreement" was an intact separate document denoted as Appendix B and was appended to Appendix A, the list of the eight employees who were selected to participate in the Severance Pay Plan, including the terms of Koso's offer.

Mark Vincent Chester was not one of the eight employees who was selected to participate in the Severance Pay Plan, and his name is not listed among the eight employees to whom Koso made its offer. Appendix A and Appendix B were the two parts comprising the Severance Pay Plan and the condition precedent to the employee's participation in the Plan. At his deposition, Chester testified that he never received either Appendix A or Appendix B at any time, was never invited to participate in that plan, and never signed any confidentiality agreement of any type while employed at Koso. Those denials are consistent with the other evidence in the case:

1. His name does not appear as one of the eight employees.
2. There is no document produced by REXA to show Chester was ever intended to be a recipient of the offer or credible evidence that he received any such document.
3. There is no credible evidence of any kind that Chester was ever asked to sign any similar document while employed at Koso.

So what is it that supports the position of the Defendants that the Plaintiff engaged

9

in deception in an attempt to elicit a false answer from Chester at his deposition that he, indeed, received the Assignment Agreement reflected as Appendix B and, presumably, signed it?

Chester and about 30 other employees besides Chester received a different kind of letter, dated September 20, 2000, from Koso management which offered Chester and the other recipients a bonus at the sole discretion of the board of directors if ownership of the company changed. This "bonus letter" did not require any employee to sign any document or agree to any new terms of employment in order to receive the bonus benefit. The bonus was to be paid at the sole discretion of the board.

Even though Appendix B, the Assignment Agreement, was not part of the "bonus letter" to Chester and the 30 others, at Chester's deposition on July 24, 2018, counsel introduced the "bonus letter" in Chester's deposition as Exhibit 14. The exhibit was fabricated to include the Confidentiality, Nonsolicitation, Non-Competition and Assignment Agreement that was part of the offer to the eight employees previously described above. Even though Appendix B was not part of Chester's Bonus Letter, the Chester Bonus Letter and unrelated 10-page Assignment Agreement were consecutively bates labelled as REXA 0090216 through REXA 0090228.

Appendix A of the Severance Plan listing the eight selected employees was missing from Exhibit 14. Although produced to the Defendants, it was placed in the discovery documents at a different location at REXA 0090323, almost 100 pages away from the Chester Bonus Letter. Mr. Chester's Bonus Letter and the Exhibit 14

10

Assignment Agreement were alleged by the Defendants not to have been received in discovery in an array of other PDF files concerning the 30 other employee letters, Appendix B, and other severance plan documents. The defense alleges Chester's Bonus Letter was located among unrelated documents, including emails, spreadsheets, drawings and logs. The important Appendix A list was one hundred pages away from Mr. Chester's Bonus Letter.

The following matters in the record compel the conclusion that Chester never received and never signed Appendix B, the nondisclosure and assignment agreement, which Plaintiff claims was presented to Chester, that he signed it, but cannot be found at this time.

1. Appendix B contains content logically related to Appendix A.
2. Appendix A sets forth the names of the recipients of the offer contained therein, and Appendix B sets forth the required agreement and signature of the recipients of the offer as a condition to acceptance. Mark Vincent Chester was not listed as a recipient.
3. Mark Vincent Chester testified that he neither received nor signed the condition precedent to the acceptance of the offer embodied in Appendix A, nor was he listed in Appendix A.
4. When Appendix B was presented to Chester as part of an exhibit during his deposition, Appendix A was not correspondingly presented or otherwise associated with Appendix B in content or by identity of recipients.
5. When Appendix B was presented to Chester during his deposition, it was in

connection with a bonus plan to about 30 employees, including Chester. Any bonus was to be determined in the sole discretion of the board and did not require signatures of the recipients as conditions precedent, rendering unnecessary any concomitant agreements by the recipient employees.

6. The condition of the discovery files maintained by the Plaintiff and by whom is not necessary to be determined in order to decide whether they were fairly presented and used by the Plaintiff in its deposition examination of Chester.

Appendix A and Appendix B are logically related by subject matter, sequencing, and addressees. The regular and ordinary course of business would call for their connection in matters of record keeping, and usage in litigation matters of significance and importance. That they were not done so is manifest. That they were separated and used to induce a false answer is also manifest.

The deception contained in the interrogatory answer served, among other things, to preclude the filing of a Rule 12(b)(6) motion by the Defendants at the outset of the case. If the Plaintiff's answer had been truthful about Chester's employer at the time of the 2002 experiment, that it was the company Koso and not REXA, the legal rights and obligations of the parties might have been decided as purely matters of law and could have foreclosed the length, depth, and cost of discovery which each side has had to bear.

The three cases cited by this Court in deciding summary judgment motions could have been addressed early on if the actual employer of Chester had been acknowledged by REXA.

REXA has relied on two cases in asserting the existence of an obligation implied-in-fact and imposed on a departed employee to maintain confidentiality when it comes to matters of trade secrets of the employer. Both *Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 839 (1972), and *Whipps, Inc. v. Ross Valve Mfg. Co.*, 2014 WL 1874754 (D. Mass. 2014), described the employer-employee relationships for the legal obligations on the part of the departed employees.

The case of *Securitas Sec. Servs. USA, Inc. v. Jenkins*, 2003 Mass. Super LEXIS 200 (Super. Ct. of Mass. 2003), 16 Mass. L. Rep. 486, is closer to the facts of this case. Although that case involved a covenant not to compete and to not divulge trade secrets, the former employer of the defendant was not the plaintiff in the case. The plaintiff was the successor to the defendant's employer, and the successor company had neither employed the defendant nor secured the defendant's consent to the assignment of his employment contract with the former employer.

The holding in *Securitas* is that everyone has a right to select and determine with whom he will contract and cannot have another person thrust upon him without his consent. It is undisputed that REXA did not have a contract with Chester. Nor, it might be added, did Koso have a written employment contract with Chester.

Had the true legal relationships among the parties and Koso been acknowledged from the outset, the exhaustive discovery that took place might well have been unnecessary. Plaintiff's deceit foreclosed the opportunity for an early resolution of this lawsuit.

## 2. Other Discovery Conduct

Defendants also accuse Plaintiff of entangling it, an innovative competitor, in extensive litigation rather than to protect a purported trade secret. For example, the Defendants rely, for recovery of their fees and costs, in part, on the extensive and burdensome written requests for admissions Chester was confronted with. Chester had to answer 258 such requests, and MEA had to answer 140 such requests. To quote the Defendants' petition for fees, "The Court can determine that REXA served its excessive requests for admissions merely to entangle Defendants in useless litigation tasks, because REXA needed none of those requests for admissions in the summary judgment process." Plaintiff did not cite to any of Chester's answers in its summary judgment materials and to only one of MEA's answers, the location of its offices.

In *Loparex, LLC v. MPI Release, Inc.*, 2012 WL 3065428, a case involving trade secrets, my sister Judge Joan Lefkow remarked, "the action was essentially a vendetta against [defendants], designed to litigate them to death rather than out of a genuine concern about protecting intellectual property." As the entirety of this litigation becomes more deeply plumbed, a like conclusion becomes ingrained when assessing the entirety of REXA's conduct in filing this action and how it was maintained.

REXA and its counsel have been accused by the Defendants of engaging in bad faith and cite several instances supporting the charge. The Court has chosen to highlight the most egregious ones but relies on others addressed in Defendants' fee petitions. REXA is accused of shifting its theories of liability as a reflection of its lack of good

14

faith in pursuing the Defendants. For example, Defendants say that REXA's primary summary judgment argument asserted that MEA falsely advertised a hazardous area certification. This was a theory of recovery that REXA never alleged in the Amended Complaint. The charge of false advertisement appears to be a late add-on. The key words "hazardous," "area," "certification" and "advertisement" do not appear in the Amended Complaint.

In the absence of objective and specific evidence to support the legal conclusions propagated by REXA, it has resorted to the use of terms such as "infer," "imply," and "understanding" to reach its desired conclusions. For example, in the absence of a written employment contract between Chester and Koso, REXA offers its understanding of their relationship. Although contracts between parties require a mutual meeting of the minds over the terms establishing rights and obligations, REXA offers its own view of what Chester thought he was obligated for when he worked for Koso and what Koso thought it was entitled to in allowing Chester to be employed by it.

The next legal indulgence proffered by REXA is that the oral understanding of a binding contract between Koso and Chester was later transferred, by inference or implication, to itself, even though specifically not memorialized in any document, other objective evidence, or detailed anywhere as to the rights and obligations transferred or the period of time of the contract's validity. Was Chester bound for a lifetime to Koso? To REXA? To do what? Likewise, was Koso bound to employ Chester for a lifetime? Was REXA? To do what?

Chester resigned from Koso on July 14, 2003. He took jobs in the actuator industry and worked for various competitors of Koso until his employment with MEA many years later. From the time that Chester left Koso on July 14, 2003, until he was served with this lawsuit in December 2017, no one from Koso or REXA ever notified Chester that he had a contractual obligation to either company, whether expressly or by implication, to refrain from working in competition against either company or using any knowledge or experience gained while working with Koso.

### 3. Taken Together, Plaintiff's Conduct Merits An Attorney's Fees Award

Defendants MEA and Mark Vincent Chester have petitioned this Court for fees and non-taxable expenses against Plaintiff REXA and its counsel following the award of summary judgment in their favor. They have incurred the sum of $2,187,071.12 to defend against REXA's lawsuit, calling the suit improperly commenced and maintained. The Court agrees with their characterization of the suit itself. The substance of the claims lacked merit. The way the case was prosecuted was sanctionable, compounding the burdens of defense counsel and their clients in defeating the claims against them.

Adding to the Defendants' pressures in staving off meritless attacks on their professional conduct was the request for the assignment of intellectual property rights involving a device named the Hawk actuator. The Hawk was invented by Mr. Chester and MEA. Actuators are used in a variety of industries, and the Hawk enjoys widespread usage and commercial success. The Defendants were accused of exploiting a stolen trade secret essential to the construction and operation of the Hawk.

The lawsuit necessitated substantial discovery with correspondingly high costs experienced by both sides. Included was examination of thousands of documents, numerous depositions, and retention of expert witnesses. Contributing to the Defendants' burdens of defense were the sometimes oppressive and needless obligations imposed on them by the conduct they were confronted with.

The preceding portions of this opinion describe and discuss some of the conduct engaged in which compels the award of fees in the full amount requested by the Defendants and their counsel. This opinion simply touches on the highlights of that conduct. Although not fully addressed, all matters brought to the Court's attention were reviewed and considered.

The actions of the Plaintiff and their counsel entailed both substantive and procedural reasons for the Court's decision to award Defendants and their counsel the full amount sought. As described earlier in this opinion, the fundamental underpinning for the theft claim here involves a two-month experiment conducted by Koso, employer of Chester, to improve an actuator then sold by Koso and do so in a way to eliminate royalty payments Koso had to make to another company. The experiment was not successful, the device constructed to assist was disassembled, most of the paper detailing the work was discarded, and the project was canned.

Many years later, Chester and others at MEA invented and constructed a device called the Hawk which worked quite well and enjoyed commercial success. The Hawk competed with others in the market, including one sold by the Plaintiff. Thus, began the

17

fray.

The Hawk was developed by Chester and MEA over a two-year period before a patent was sought and its success was established. It was apparently not forgotten that, once upon a time, a company other than REXA (which did not exist in 2002) might be the vehicle for REXA to claim the theft of trade secrets which REXA could capitalize on since Chester once worked there and was involved in the 2002 experiment.

The Court believes that not only is the Plaintiff's claim without merit, it is baseless. No attempt was ever made by anybody, Koso or REXA, to reengage the 2002 experiment to improve the results or otherwise use the results of the work. There can be no question that whatever device was created was not the same or like the Hawk. The Hawk has succeeded in the toughest place – the market – and the experimental device did not get past the experimental phase – it was a failure. As a matter of substance, the suit may have been brought on the proverbial wing and a prayer, but it was not brought based on substantive merit.

As for the manner of prosecution, the opinion has cited instances of deceptive conduct engaged in, from misidentifying parties and their actions or appropriating acts of others for themselves. There is also no question that exhibits were falsified in order to induce a false concession on a matter of material factual importance. Chester never had a written employment contract with Koso, making it difficult, if not impossible, to assign it to a different entity. Even to the end, REXA insisted there did exist such an employment agreement – it just couldn't be found.

The other major item worthy of comment here is the oppressive nature of some discovery demands and conduct, all leading to the necessity of Defendants' counsel to respond to or to contest. It is more than ironic that Plaintiff's counsel is objecting to fees for defense attorney time that was necessitated by the unreasonable demands of Plaintiff's counsel in the first instance.

Perhaps the final irony is Plaintiff's argument that the fee request should be cut in half, even as its own fees equaled or exceeded that of the Defendants. We reject both the Plaintiff's arguments and its calculus.

## **CONCLUSION**

It is the genius of American law to encourage invention and resulting progress as an objective of commercial life in our country. This is achieved both by rewarding those who conceive of new and better ideas and the manifestation of them in new and better products or in better ways to operate. One of the ways this is done is to give the creator of the idea or product the exclusive right to exploit the benefits of the creation. At the same time, the idea and result are enjoyed by all who desire to avail themselves of the new thing, whatever it is. This permits universal knowledge of progress and, in theory, inspires desires by others to improve the new thing.

This lawsuit reflects the antithesis of that protocol. It represents an attempt to convert a failed experiment into a successful result by appropriating the spoils of success to itself and dispossessing the real contributor of ideas and labors of what he has achieved. The law does not permit those outcomes in general, nor will the Court allow

it in this case. Judgment will be entered for Defendants in the full amount of its legal fees and costs as requested.

Dated: 3/2/2021

*Charles P. Kocoras*
Charles P. Kocoras
United States District Judge

20